| | |
|---|---|
| CHIP FUTRELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | ORDER |
| NORTH CAROLINA STATE ) | |
| UNIVERSITY, a Constituent Institution of ) | |
| University of North Carolina, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (DE 17). The motion has been briefed fully, and in this posture the issues raised are ripe for ruling. For the following reasons, the motion is denied.

## STATEMENT OF THE CASE

Plaintiff commenced this employment discrimination action in Wake County Superior Court on July 13, 2020, asserting a claim for failure to promote because of sexual orientation, against his current employer, defendant, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"). Plaintiff seeks compensatory damages, declaratory judgment, promotion, back pay, front pay, reimbursement for lost benefits, costs, fees, and interest.

After defendant removed the case to this court, plaintiff filed the operative amended complaint on October 1, 2020, adding additional factual allegations in support of his claim.[1] Defendant filed

---

[1] Prior to filing of operative amended complaint, defendant moved to dismiss the original complaint for failure to state a claim. On January 7, 2021, the court denied that motion as moot in light of the filing of the operative amended

the instant motion to dismiss November 16, 2020, relying upon a job prospectus for a vice provost position; an announcement for interviews; a United States Equal Opportunity Commission ("EEOC") dismissal and notice of rights letter; and a tolling agreement between the parties. Plaintiff timely responded in opposition to which defendant replied in support of its motion January 19, 2021.

## STATEMENT OF THE FACTS

The facts alleged in the complaint may be summarized as follows.

"Plaintiff is a fifty-one-year-old gay male." (Compl. ¶8). Starting in April 2013, plaintiff held the position of "Director for Continuing and Professional Education" for defendant. (Id. ¶ 19). In this position, "[h]e was responsible for the following six non-credit units: Office of Professional Development, Technology Training Solutions, the McKimmon Conference and Training Center, Marketing Services, McKimmon Print Services and Customized Contractual Education." (Id.). "Plaintiff was also responsible for a seven-million-dollar budget, thirty-five permanent employees and fifty temporary employees." (Id.).

"On October 1, 2018, [p]laintiff was named the Interim Vice Provost of Continuing Education following the retirement of the then Vice Provost of Continuing Education." (Id. ¶ 21). "As the Interim Vice Provost of Continuing Education, Plaintiff was responsible for leadership of the McKimmon Center for Extension and Continuing Education division." (Id. ¶ 22). He oversaw a budget of $43,000,000.00 and ultimately was responsible for more than 200 employees. (Id.).

"After being named the Interim Vice Provost of Continuing Education, [p]laintiff successfully fulfilled the duties and responsibilities of both the Interim Provost and Continuing Education position and the Director of Continuing and Professional Education position." (Id. ¶ 23). "As the Interim Vice Provost of Continuing Education, [p]laintiff reported directly to Dr. Thomas Miller ["Miller"],

---

complaint. Hereinafter, all references to the complaint or "Compl." in citations are to the operative amended complaint, filed October 1, 2020.

2

Defendant's Senior Vice Provost for Academic Outreach and Entrepreneurship." (Id. ¶ 24). "Miller later congratulated Plaintiff for successfully performing the duties of two separate positions." (Id.).

"Defendant advertised the Vice Provost of Continuing Education position" (hereinafter, the "position") in January 2019. (Id. ¶ 25).[2] "Plaintiff applied for [the] position on or about February 25, 2019." (Id.). "At the time [p]laintiff applied for [the] position, he met all of the minimum qualifications and all but one of the preferred qualifications for the position." (Id.). "Specifically, [p]laintiff did not have a doctoral degree at the time of his application." (Id.).

"Nine individuals were selected to serve on the search committee for [the] position." (Id. ¶ 26). "At least five of the nine members of the search committee knew [p]laintiff's sexual orientation." (Id.). "At least one of the nine members discussed [p]laintiff's sexual orientation with [] Miller." (Id.). "As such, [] Miller was aware of [p]laintiff's sexual orientation." (Id.).

"On March 28, 2019, [p]laintiff was notified that he had been selected for a first-round video conference interview." (Id. ¶ 27). "Defendant's search committee would not have selected [p]laintiff for a first-round interview if [p]laintiff did not possess the minimum qualifications for the position." (Id.). Plaintiff interviewed for the position on April 11, 2019. "On the following day, Leslie Boney ["Boney"], the search committee chairperson, told [p]laintiff that he had 'killed it' during his interview," which plaintiff interpreted "to mean that he had done very well during his interview." (Id. ¶ 28).

On April 24, 2019, defendant announced that three finalists had been selected for the position. Those finalists were Mark Bernhard ("Bernhard"), James Shaeffer ("Shaeffer") and Chris LaBelle ("LaBelle"). Plaintiff was not chosen as one of the three finalists.

---

[2] Plaintiff does not include a copy of the position advertisement with his complaint. Defendant attaches a "Job Prospectus for the Vice Provost, Continuing Education" as an exhibit to its motion to dismiss, the contents of which will be addressed in the analysis herein. (See Def's Mem. Ex. A (DE 18-1)).

3

"All three of the finalists spoke in open sessions during the interview process." (Id. ¶ 30). "All three mentioned their wives and children during those sessions." (Id.). "None of the three finalists were gay males." (Id.). After learning that he had not been chosen as a finalist for the position, plaintiff asked Boney if plaintiff's "lack of a doctoral degree was a factor in [p]laintiff's non-selection." (Id. ¶ 31). "Boney told [p]laintiff that the lack of a doctoral degree was not a factor." (Id.). "Miller ultimately decided which of the three finalists would be selected" for the position. (Id. ¶ 32).

On April 25, 2019, plaintiff requested a copy of the interview notes that the committee members had made following his interview. Defendant provided plaintiff with a copy of the requested interview notes May 15, 2019. "The notes made by one unidentified interview committee member referred to [p]laintiff as a 'plugger.'" (Id. ¶ 33). According to plaintiff, "'[p]lugger' is a term that is often used to refer to a gay man who has anal sex with another man," and "The Urban Dictionary defines plugger as 'a man who enjoys anal sex with another man on a regular basis.'" (Id.). "Plaintiff and a number of other employees at [d]efendant's McKimmon Center consider 'plugger' to be a derogatory term when used in reference to gay males." (Id.).

On May 22, 2019, plaintiff learned that Bernhard, a heterosexual male, had accepted the position. Bernhard began employment with defendant on or about June 26, 2019. "Plaintiff returned to his former position as the Director for Continuing and Professional Education at that same time." (Id. ¶ 35).

"On June 26, 2019, [] Miller gave [p]laintiff a written evaluation of [p]laintiff's performance as Interim Vice Provost." (Id. ¶ 36). Miller rated plaintiff's performance as exceeding expectations. "Since Bernhard began working in [the] position, he has relied on [plaintiff's] experience and

expertise in performing the duties of Bernhard's position." (Id. ¶ 37). According to the complaint, "[p]laintiff was more qualified for [the] position than [] Bernhard." (Id. ¶ 38).

> Plaintiff had more experience in continuing education positions than Bernhard. In addition, Plaintiff had a vastly superior understanding of Defendant's role in the state and region than Bernhard. Plaintiff received both his undergraduate and graduate degrees from Defendant. Plaintiff had worked for Defendant for almost twenty-eight years at the time Bernhard was selected for the position. In contrast, Bernhard had never worked for Defendant. Furthermore, Plaintiff has spent years cultivating relationships within the McKimmon Center staff, the university community, the state and region. Bernhard has no such connections. Finally, Plaintiff had actually performed the duties of the Vice Provost of Continuing Education while serving as the Interim Vice Provost.

(Id.). Plaintiff also allegedly was more qualified for the position than Labelle and Shaeffer, for similar reasons. "None of the three aforementioned finalists for [the] position had experience managing a conference center such as the McKimmon Conference and Training Center." (Id. ¶ 41). Prior to Bernhard's selection for the position, "all previous Vice Provosts had experience managing the McKimmon Conference and Training Center or a similar facility prior to becoming Vice Provost." (Id. ¶ 42).

On May 16, 2019, plaintiff requested a formal investigation by defendant's Office of Institutional Equity and Diversity ("OIED"), asserting that he had not been promoted to the position because of his sexual orientation. The OIED issued an investigative summary on August 7, 2019, finding that no policy violation had occurred. "Said summary, however, failed to identify the interview committee member who referred to [p]laintiff as a plugger," and "OIED made no effort to determine the author of the plugger comment nor did OIED attempt to learn what the author meant by such comment." (Id. ¶ 44). According to plaintiff, "OIED failed to conduct a full and fair investigation concerning [p]laintiff's failure to be promoted" to the position. (Id. ¶ 45).

5

**COURT'S DISCUSSION**

A.  Standard of Review

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

B.  Analysis

Defendant argues that plaintiff's claim must be dismissed under Rule 12(b)(6) for failure to allege sufficient facts to support a claim of discrimination.

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1); see Bostock v. Clayton Cty., Georgia, 140 S. Ct. 1731, 1741 (2020) ("[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."). "In the context of a Title VII case, an employment discrimination plaintiff need not plead a prima facie case of discrimination to survive a motion to dismiss." Bing v. Brivo Sys., LLC, 959 F.3d 605, 616 (4th Cir. 2020).[3] "Instead, a Title VII plaintiff is required to allege facts to satisfy the elements of a cause of action created by that

---

3  In all citations in this order, internal quotations are omitted unless otherwise specified.

statute." Id. "Accordingly, [the court's] inquiry is whether [the plaintiff] alleges facts that plausibly state a violation of Title VII above a speculative level." Id.

Here, plaintiff has alleged sufficient facts to plausibly state a violation of Title VII above a speculative level. He alleges he applied for the position when he was serving as interim vice provost for continuing education, and that he met all of the required qualifications of the position. (Compl. ¶ 25). He alleges that "[a]t least five of the nine members of the search committee knew [p]laintiff's sexual orientation" as a gay male. (Id. ¶ 26). The complaint permits an inference that the search committee was responsible for selecting three finalists after a first round of interviews, in which plaintiff participated. (See id. ¶¶ 27-29, 31, 32).

Further plaintiff alleges facts permitting an inference that he was not selected as a finalist because of his sexual orientation as a gay male. In particular, the chair of the search committee indicated to plaintiff he had "done very well during his interview." (Id. ¶ 28). Miller had rated plaintiff's performance in the interim vice provost position as "exceeding expectations." (Id. ¶ 36). And, according to the complaint, plaintiff was more qualified for the position than any of the three finalists. (Id. ¶¶ 38-40).

However, the notes made by one interview committee member "referred to [p]laintiff as a 'plugger.'" (Id. ¶ 33). According to the complaint, "'[p]lugger' is a term that is often used to refer to a gay man who has anal sex with another man," and "The Urban Dictionary defines plugger as 'a man who enjoys anal sex with another man on a regular basis.'" (Id.). "Plaintiff and a number of other employees at [d]efendant's McKimmon Center consider 'plugger' to be a derogatory term when used in reference to gay males." (Id.). In addition, "[n]one of the three finalists were gay males," and they "mentioned their wives and children during their" finalist interview sessions. (Id. ¶ 30). Ultimately, Miller selected Bernhard, a heterosexual male, for the position from the three finalists.

7

(Id. ¶ 34). Finally, upon plaintiff's request for an investigation, "OIED made no effort to determine the author of the plugger comment nor did OIED attempt to learn what the author meant by such comment." (Id. ¶ 44).

The foregoing facts give rise to a plausible inference that plaintiff was not selected as a finalist, and not selected for the position, because of his sexual orientation. Accordingly, plaintiff has stated a claim of discrimination on the basis of sex in violation of Title VII.

Defendant argues, nonetheless, that this case is analogous to others in which courts have dismissed Title VII complaints for failure to state a claim. For example, defendant cites to Bing, in which the court stated that "[b]eing aware of no alternative explanation and guessing that conduct is racially motivated does not amount to pleading actual facts to support a claim of racial discrimination." 959 F.3d at 618. There, the plaintiff did not allege that "anyone . . . said or did anything suggesting that the search was racially motivated." Id. at 617. In this instant case, however, plaintiff is not merely "guessing that conduct is . . . motivated [by discriminatory animus]," but rather alleges that the reference in one interview committee member's notes to "plugger" demonstrates discriminatory animus. (Compl. ¶ 33). Accordingly, Bing is instructively distinguishable.

Defendant also cites to McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin., 780 F.3d 582 (4th Cir. 2015), where the court upheld dismissal of a complaint asserting a Title VII claim for race and sex discrimination. There, the plaintiff alleged "[d]uring the course of her interview, and based upon the history of hires within [that agency], . . . both [supervisors] predetermined to select for both positions a White male or female candidate." Id. at 583. "But she alleged no factual basis for what happened 'during the course of her interview' to support the alleged conclusion." Id. at 586. There, the court noted that "[o]nly speculation can fill the gaps in her complaint—speculation as to why two 'non-Black candidates' were selected to fill the positions

8

instead of her." Id. In the instant case, by contrast, plaintiff alleges a factual basis for what happened during the course of the interview process to support the alleged conclusion of discrimination based upon gender, in the form of the "plugger" note, coupled with alleged facts concerning plaintiff's superior qualifications. (Compl. ¶¶ 28, 33, 36, 38-40). These facts nudge plaintiff's complaint of discrimination from conceivable to plausible, and serve to distinguish this case from McCleary-Evans.[4]

Defendant argues that "plugger" should not be interpreted as a derogatory term. Defendant cites, for example, the definition of the term "plugger" in the Oxford English Dictionary, which does not include any references to a persons' sexual orientation or activities, and instead includes definitions such as "[a] person . . . or animal which perseveres steadily and laboriously with a journey or task." (Def's Mem. (DE 18) at 12; see Reply (DE 22) at 4-5). Defendant also notes several other definitions contained in the "Urban Dictionary," which is referenced in the complaint. (See id. at 11 n. 3; Compl. ¶ 34). The complaint, however, expressly states that "[t]he Urban Dictionary defines plugger as 'a man who enjoys anal sex with another man on a regular basis,'" and that "employees at [the] McKimmon Center consider 'plugger' to be a derogatory term when used in reference to gay males." (Compl. ¶ 34). At this juncture, the court is mindful that it "must draw all reasonable inferences in favor of" plaintiff, Robertson v. Anderson Mill Elementary Sch., 989 F.3d 282, 288

---

[4] Defendant cites to Lebowitz v. New York City Dep't of Educ., 407 F. Supp. 3d 158, 176 (E.D.N.Y. 2017), for the proposition that "stray remarks . . . even if made by a decisionmaker, without more, cannot get a discrimination suit to a jury." (Def's Reply (DE 22) at 5). Lebowitz, however, is inapposite for several reasons. First, it was evaluating a claim under the New York City Human Rights Law. See id. Second, the remarks made in that case were not made in the course of an interview or hiring decision, as here. See id. at 168-169. Third, the remarks in that case concerned a teacher's foreign accent, and the court allowed a federal claim for age discrimination to proceed. See id. at 173. Finally, the case is not persuasive because it does not address standards for pleading under the law of this circuit.

9

(4th Cir. 2021). Hence, the court must credit plaintiff's allegations as true. Of course defendant will have an opportunity to explain the intended use of the term in the interview notes at a latter juncture in the case.

Defendant argues that the court must not credit plaintiff's allegations about his superior qualifications. In particular, defendant points to the list of "Minimum Qualifications" and "Preferred Qualifications" in the "Job Prospectus" for the position, which is attached as an exhibit to its motion to dismiss. (DE 18-1; see also Reply (DE 22) at 6-7). Defendant also cites to Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 269 (4th Cir. 2005), for the proposition that a plaintiff "cannot establish her own criteria for judging her qualifications for the promotion" and instead "must compete for the promotion based on the qualifications established by her employer." In so arguing, however, defendant conflates two inquiries required at different stages of the case: 1) upon a summary judgment pretext analysis, the court need not credit plaintiff's unilateral view of the superiority of his qualifications for a promotion, see, e.g., id., and 2) upon motion to dismiss, the court must view the facts in the light most favorable to plaintiff and draw all reasonable inferences in his favor. Robertson, 989 F.3d at 288.

Here, plaintiff does not allege merely that he viewed his own qualifications as superior, but rather that they actually were superior to the other three finalists, supported by non-conclusory allegations. (Compl. ¶¶ 38-41). Defendant's citation to its "Job Prospectus" for the position does not defeat plaintiff's claim at this juncture. While it provides a listing of minimum and preferred qualifications, it says nothing about how defendant actually ranked the candidates, or which of those qualifications defendant considered important or more important in actually making its hiring decision. (See, e.g., DE 18-1 at 3-4). This is the type of evidence that may be considered upon the summary judgment burden-shifting framework, Anderson, 406 F.3d at 269, but it is not pertinent for

10

consideration upon motion to dismiss where defendant's reasons for non-selection are not before the court.[5]

With respect to plaintiff's qualifications, defendant relies again upon comparison to McCleary-Evans. But that case is materially different from the instant case. There, the plaintiff "did not include any allegations regarding the qualifications or suitability of the persons hired to fill the two positions." 780 F.3d at 584. Here, by contrast, plaintiff alleges that "[p]laintiff was more qualified for [the] position than [] Bernhard." (Id. ¶ 38). Specifically,

> Plaintiff had more experience in continuing education positions than Bernhard. In addition, Plaintiff had a vastly superior understanding of Defendant's role in the state and region than Bernhard. Plaintiff received both his undergraduate and graduate degrees from Defendant. Plaintiff had worked for Defendant for almost twenty-eight years at the time Bernhard was selected for the position. In contrast, Bernhard had never worked for Defendant. Furthermore, Plaintiff has spent years cultivating relationships within the McKimmon Center staff, the university community, the state and region. Bernhard has no such connections. Finally, Plaintiff had actually performed the duties of the Vice Provost of Continuing Education while serving as the Interim Vice Provost.

(Id.). Thus, with respect to allegations regarding qualifications of the selectee, the instant case is distinguishable from McCleary-Evans. As noted above, although defendant suggests that plaintiff does not compare the right qualifications for the position, defendant's asserted legitimate non-discriminatory reasons for selecting Bernhard over plaintiff are not properly before the court at this juncture. For purposes of the instant motion, it is sufficient that plaintiff has alleged with specificity that he was more qualified for the position than Bernhard, coupled with allegations of discriminatory animus.

---

[5] Additional cases cited by defendant are inapposite for this same reason because they involve analysis of pretext under the summary judgment burden shifting framework. See, e.g., Evans v. TWC Admin. LLC, No. 5:15-CV-675-FL, 2017 WL 5013570, at *5 (E.D.N.C. Nov. 2, 2017) ("[P]laintiff has failed to offer any evidence to show that defendant's legitimate, non-discriminatory reason for its selection of [another] over plaintiff was pretext for intentional discrimination."); Willingham v. Mabus, No. 5:16-CV-187, 2018 WL 2324347, at *4 (E.D.N.C. May 22, 2018) (same).

Defendant also argues that plaintiff has not alleged sufficient facts to support an inference of discriminatory animus on the part of Miller. Defendant suggests there are too many unwarranted inferences to draw between the reference to "plugger" in the interview note to Miller's final decision to hire Bernhard. This argument misses the mark at this juncture, where the court must rely solely upon the allegations in the complaint. Based on those allegations alone, it is reasonable to infer that the hiring committee made the decision to select the three finalists for the position over plaintiff. (See Compl. ¶¶ 27-29, 31, 32). Thus, allegedly, it was the hiring committee, including the one who referred to plaintiff as a "plugger," who made the decision to exclude plaintiff from consideration. In any event, even if Miller had a role in selecting the finalists, plaintiff alleges that one of the committee members "discussed [p]laintiff's sexual orientation with [] Miller." (Id. ¶ 26). Such an alleged discussion, which is unrelated to the qualifications for the job, permits an inference that Miller and the committee members took plaintiff's homosexuality into account in not selecting him.

Finally, defendant suggests that Miller would not have selected plaintiff for the interim position and would not have given him a "glowing performance review" if Miller had discriminatory animus towards plaintiff. (Def's Mem. (DE 18) at 25). However, plaintiff's claim is based upon non-selection for a promotion, not discharge from his existing position. Thus, Miller's treatment of plaintiff in his current position does not foreclose a claim of failure to promote. In so holding, the court expresses no opinion on the viability of plaintiff's claims upon a more complete record, particularly one in which the viewpoint of the decisionmaker is presented.

In sum, plaintiff has stated a claim for discrimination on the basis of his sex, in violation of Title VII. Therefore, defendant's motion to dismiss must be denied.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss is (DE 17) DENIED. Pursuant to Federal Rule of Civil Procedure 12(a)(4), a responsive pleading must be filed within 14 days of the instant order.

SO ORDERED, this the 10th day of August, 2021.

_____
LOUISE W. FLANAGAN
United States District Judge